UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROT VAN NGUYEN,

           Petitioner,

    v.

MATTHEW CATE, Warden,

           Respondent.

Case No. 12-616 WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

In 2009, a jury in the California Superior Court for the County of Santa Clara found petitioner Rot Van Nguyen guilty of two felony counts of lewd acts upon a child under 14 years of age (Cal. Penal Code §288(a)), and one misdemeanor count of prowling and peeking (Cal. Penal Code § 647(i)).  Nguyen received a sentence of eight years and eight months in state prison.  On direct appeal, the California Court of Appeal affirmed the conviction, and the California Supreme Court denied review.  Nguyen seeks federal habeas relief from his state convictions.  Because the record does not reflect that there was jury coercion, a due process violation, or ineffective assistance of counsel, and because the jury instructions would have cured the cumulative problems alleged by Nguyen if any had occurred, the petition for habeas relief is DENIED.

# BACKGROUND

The following factual background is taken from the order of the California Court of Appeal:

A. *Evidence*

1. *Prosecution Case*

T., the female victim, turned 15 years shortly before testifying at trial in June 2009. She lived in a house with her mother and three half brothers, who were related to her through their mother. She had her own bedroom. At the time of trial, her older half brother was 19 years old, a younger half brother was five years old, and her youngest half brother was one year old and she referred to them as brothers in her testimony. Defendant was the father of her five-year-old half brother. Between 2005 and 2007, defendant was in and out of T.'s house.

In the summer of 2007, T. was living in the same house and had the same bedroom. Her mother and defendant were dating and defendant would come and go from their house. In June 2007, after the school year at her middle school ended and while her mother was in Vietnam, defendant touched her more than once in her bedroom.

With respect to the first occasion of inappropriate touching in June 2007, T. had gone to bed in the evening and had closed but not locked her bedroom door. She awoke around six or seven in the morning and found defendant in his boxer shorts, lying behind her. She was lying on the bed on her left side, facing the door. She could feel his erect penis pressed against her buttocks and she could hear him breathing hard. Defendant touched her over her pajamas on her legs and her breasts. She felt his hands on her skin touching her waist. When she asked him what he was doing in her room, he claimed to be watching the TV, which was on, even though he was not facing it. He rubbed her right breast for a couple of minutes. She ran out of her room and went to her oldest brother's room, where he was sleeping. T. was crying but she did not tell her brother what happened because she was scared. She lay down and slept on his floor.

The following night, T. went to bed in the evening and closed and locked her bedroom door. She awoke around six or seven in the morning and again found defendant lying behind her. Defendant again

2

touched her legs going up toward her waist and her breasts. There was skin-to-skin contact when he touched the side of her waist. The next night, T. went to bed around the same time and closed and locked her bedroom door. When she awoke around six or seven in the morning, she found defendant behind her for the third time. He again touched her; he touched her legs, face and breasts.

The victim indicated that the lock on her bedroom door could be opened with either a knife or a screw. After both the second and third touching incidents, she ran into her brother's room and slept on his floor but did not tell him what happened.

Later in the day of the third incident, T. disclosed what happened to her older female cousin, who was about 19 or 20 years old at the time of trial. The cousin was shocked and scared and advised her to tell her older brother.

When T. returned home that night after seeing her cousin, she went into her bedroom, turned on the light, and found defendant on the floor of her room. They made eye contact but he did not say anything to her and she walked out of her room and went to her older brother's room. She told him about defendant touching her in her room and he reacted angrily. He instructed her to pack her belongings and told her she was going to stay at his friend's house for the night. He made arrangements for her to stay with a male friend.

T. did not immediately report what happened in June 2007 to the police because her brother and she were scared of what defendant would do. She explained that she was afraid of defendant because of what he had done and because he had threatened her mother, her brother, and her. She recalled an incident in about May or June 2005 when she awoke to a "loud slap noise" and saw defendant "slapping [her] mom on the face and punching her in the face." Defendant had said he would kill her mother and had followed her mother into the restroom holding a knife. She had been scared. He also had threatened to kill both her brother and her at the same time.

During another incident when she was elementary school age, T. was staring at defendant because he was yelling at her mother. Defendant became angry with her because she was staring at him and tried to attack her with the remote control.

On another occasion, defendant threatened to kill T.'s mother.

United States District Court
Northern District of California

T. also remembered seeing, in about August 2005, a dent in her mother's door. Defendant had thrown an axe at the door because he wanted her mother to open the door. He was not supposed to be at their home because there was a restraining order against him. She did not see the incident but she was told about it by her mother.

After the touching incidents in June 2007, the victim told her mother what happened over the phone; her mother was shocked and told her to stay with her father. T. stayed with others until her mother returned from Vietnam about two months later.

At some point, she learned from her brother that his friend had seen defendant going through her drawers. One day, she returned home to retrieve some of her belongings. Her dresser drawers were open and she found a pair of her panties that had been ripped or cut. That scared her.

When her mother returned home, T. went back home. Defendant was still there but he did not touch her again.

Defendant engaged in other conduct, however, that shocked and scared T. He peeked at her through her bedroom window several times. When the window blinds were open, defendant popped up at her window and looked in while she was changing her clothes or after she emerged from the shower and wearing towel. He never saw her completely naked.

On November 25, 2008, T. spoke with a counselor at her high school because she could not take any more. Defendant had peeked at her through her window about a week earlier. Later that same day, she talked to Officer Todd at the school.

Carl Lewis, formerly a senior criminal investigator with the District Attorney's Office, Bureau of Investigation and now a consultant, was recognized by the court as an expert on the behaviors of children disclosing sexual abuse and on the Child Sexual Abuse Accommodation Syndrome (CSAAS). Lewis stated that "30-plus years of research and practical experience" have shown that it is not true that "any child who is being molested would immediately cry out or tell someone to try to get it to stop." In the overwhelming majority of cases that he had investigated there was a delay between the abuse and the time the child is first able to talk about it.

Lewis explained the five elements of the CSAAS, which are (1) secrecy,

4

(2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, unconvincing disclosure, and (5) retraction. These five categories merely describe how children typically reacted differently than common expectations; they are not symptoms of abuse. The syndrome was intended to be used to educate and dispel erroneous, preconceived ideas about how child molestation victims behave.

As to secrecy, Lewis stated that the molestation or sexual abuse of a child "occurs almost exclusively when the offender is alone or somehow isolated with the child." In most cases, an offender will either create or take advantage of some opportunity of secrecy "such as waiting until everybody else has left the house, waiting until everybody else is asleep, maybe going to a secluded area, closing or locking a door, turning up a television to muffle any sounds." A sense of secrecy is created also because sexual abuse of a child "carries with it a great societal taboo." The secrecy means only the child and the molester know that molestation is occurring and "there are great consequences for betraying that secret." The child's sense of shame or embarrassment may have a role in maintaining the secrecy.

Lewis described the process of "grooming" a child victim, which can reinforce the secrecy. The process involves a molester taking steps to lower a child's inhibitions and create a sense that sexual behavior with the child is normal. It may involve gradually more invasive touching that eventually includes full molestation or showing child pornography to the child. The grooming process may involve making the child feel special. It may involve threats or rewards.

The second element of the syndrome, helplessness, refers to the fact that children in our society are dependent upon adults and may be dependent upon the molester. Consequently, the disclosure process often occurs over time and "a child might let out a little bit of information to see what the adult reaction is, and then, depending upon that adult reaction, may feel more comfortable in letting out additional information." The child might express a desire not to be left with the offender but not explain the reason. Thus, the information may come out in bits and pieces, may be inconsistent, and may not be understood by the nonoffending caretaker, which often serves to reinforce the child's sense of helplessness. In addition, a child may inaccurately believe that the nonoffending caretaker has a close relationship with the offender and would tend to believe the offender over the child or that the nonoffending caretaker already knows what is going on.

Entrapment and accommodation, the third element of the syndrome, refers to the typical response of a child that is trapped in a sexually abusive situation, which is to try to put up with, or accommodate, their situation. The most common accommodation is to try "very hard to act as if nothing is wrong" and, if asked, to deny anything is wrong. The child may be fearful of the outcome of disclosing the abuse, such as suffering further abuse, getting in trouble, angering or emotionally hurting a nonoffending caretaker, or breaking up the affected unit, such as a family or scout troop. The child's fear reinforces the child's sense of being trapped.

The fourth element is delayed, conflicted, and unconvincing disclosure. Disclosure often occurs some time after the sexual abuse because the child is not immediately able to talk about it; delay does not mean that a child's claim of abuse is invalid. The child may experience an internal conflict over disclosing the sexual abuse because of the unknown result of disclosure and this conflict may add to the delay. The child's statements may conflict because the child reveals information in pieces over time.

The last element, retraction, refers to partial or complete repudiation of a disclosure of sexual abuse. Retraction may occur when "disclosure brings about a great deal of chaos in the child's life" or "focus on the child's family, the child's life." The intensity of the chaos or focus may cause the child to minimize or retract an earlier disclosure in an effort to decrease that intensity or return to how things were before.

Lewis made clear that the CSAAS is not a diagnostic tool. The syndrome is meant to convey the message that one should not make a snap judgment that sexual abuse did not occur based on preconceived ideas about child abuse. Lewis stated that the syndrome "is not a gauge that can be applied to any particular case." He made clear that the CSAAS cannot help to differentiate a valid claim of sexual abuse from a fabricated claim. He acknowledged that Dr. Roland Summit, the psychiatrist that first identified the syndrome and coined the term, became concerned that the syndrome was being misused to prove sexual abuse and had written articles about such misuse.

Darlene Rae Garcia, who was a social work intern at T.'s high school, met with her on November 25, 2008. T. was crying and hyperventilating. Eventually, T. revealed that she felt threatened by her mother's ex-boyfriend. She told Garcia that she was afraid she would get into trouble if she said anything to them and he had threatened to kill

6

or hurt her family.  She disclosed that, in the summer of 2007, she had been molested by the ex-boyfriend.  She awoke to find him next to her and he rubbed his penis against her buttocks and rubbed her breast.  She also told Garcia that, when she was not sleeping at home, her brother's friend had slept in her bed and had seen the ex-boyfriend walk into her room and smell her undergarments.  T. said that, on several occasions, she had caught the ex-boyfriend looking through her window while she dressed or after she had gotten out of the shower.

Before the People rested, the parties' stipulation was read to the jury.  It provided: "In 2005, the defendant pled no contest to and was convicted of  misdemeanor violation of Penal Code Section 242-243 (e), battery, on [T.'s mother], a person with whom he was in a dating relationship, arising out of acts that took place in May 2005.  [¶]  In 2006, the defendant pled no contest to and was convicted of a misdemeanor violation of Penal Code Section 594(a)(b)(2)(A), vandalism, and a felony violation of Penal Code Section 273.6(d), violation of restraining order preventing defendant from threatening, harassing, assaulting, battering, contacting, or disturbing the peace of [T.'s mother], where the violation involved an act of violence and credible threat of violence.  These convictions arose out of acts that took place in August 2005."

2. *Defense Case*

San Jose Police Officer Vernon Todd was working at T.'s high school as a school security officer on November 25, 2008.  He interviewed T. that day.  He knew that a sexual assault detective would follow up.

Officer Todd remembered that T. described three incidents of sexual touching that had occurred the preceding summer while her mother was in Vietnam.  T. said that, during the first incident, she awoke to find defendant rubbing his penis against her buttocks.  According to Todd, she said that his penis was exposed but his erect penis did not touch her skin.  She did not mention that defendant was in boxers or that he touched her legs, waist, or breast area.  T. told him that, during the second incident, she woke up to find defendant rubbing her breast over her clothing.  The officer did not recall her mentioning that defendant touched her legs or waist.  His report indicated that the second incident occurred the following night.  T. told him that, during the third incident, defendant pulled up her shirt and rubbed her back with his hands.  According to Officer Todd, she did not say that he touched her breasts, waist, or legs.  The officer also testified that T. reported two peeping incidents that had occurred two days in a row, approximately two weeks

7

before their interview.

Hyong Nguyen, a social worker with the Department of Family and Children Services, met with T. at the high school on November 25, 2008 after T.'s interview with San Jose police officers. The officers informed Nguyen of the situation and she did not ask T. about the molestation. The social worker's questions were directed at "the welfare and the safety of the minor in the home of the parents." T., who was very emotional and tearful at times, told her that there was a domestic violence incident involving defendant and her mother in 2005 and a restraining order was obtained. Nevertheless, defendant still came and went from their home as he pleased.

Kevin Le, a 19-year-old friend of T.'s older brother, testified that they had been friends for about a year and a half and he had visited their home 20 to 30 times. Le asserted that he had never been in T.'s bedroom. Le stated that he had never seen defendant holding or sniffing or smelling any of T.'s underwear and Le did not tell T.'s older brother that he had seen defendant doing any of those things. When she talked with the D.A.'s investigator, Le denied walking into T.'s room or seeing defendant sniff her underwear.

Le acknowledged that he did not want to be involved in the case and did not want to go to court. Le knew that T.'s older brother had told police that an unnamed friend might have seen something and Le understood that T. was the person who gave his name to the police. Le acknowledged that he did not ask his friend for the phone number of the detective on the case so he could clear up any misinformation. The only thing that Le told his friend was that he did not want to be involved. After the D.A.'s investigator talked with Le, Le was upset with T.'s older brother and called him and told him again that he did not want to be involved. In phone conversations with the prosecutor, Le said that he had never known T.'s older brother to lie. At trial, Le denied being worried about what defendant might do, but admitted that he understood from T.'s older brother that defendant had tried to set fire to their house.

Detective Tri Pham, a San Jose police officer, spoke with T. on December 4, 2008, at her high school. The interview was recorded and portions played for the jury.

Detective Pham wrote in his report that, as to the first incident, T. remembered that she woke up to rubbing against her buttocks over her pajamas and she could feel defendant's erect penis against her buttocks.

8

She did not say that his penis was exposed.  She indicated to the officer that there had been skin-to-skin contact with her legs and waist.  She pushed his hand away and went to her brother's room.

T. told Detective Pham that, during the second incident, she again awoke to defendant rubbing his penis against her buttocks.  T. did not specially know if her breasts were rubbed on this second occasion.  But she did know that defendant had touched her breasts at some point during the three incidents.  She said defendant was smiling when he was rubbing her breasts.

T. informed Detective Pham that, during the third incident, she again awoke to defendant rubbing his penis against her buttocks.  She did not mention anything about defendant rubbing her back on this occasion.

T. stated in regard to the touching, that defendant was "kind of making it look accidental."  She told the detective that "defendant was kind of making it look not obvious."

T. also informed Detective Pham that she caught him several times looking through her window when she was changing or had just gotten out of the shower.  The most recent peeping incident had occurred a few weeks before she had talked to her counselor.  She also mentioned that there had been domestic violence in the past.

3. *Rebuttal*

In lieu of the prosecution presenting rebuttal evidence, the parties stipulated to the following: "Defense investigator Brent Cooper interviewed Kevin Le on June 12th, 2009.  Mr. Cooper wrote in his report that Mr. Le said he entered [T.'s] bedroom for brief occasions but that he had never taken a nap in her bedroom."

(Cal. Ct. App. Opinion ("Op."), pp. 2-11; Ans. Ex. E.)

Nguyen filed the instant action on February 7, 2012.  As grounds for federal habeas relief, Nguyen claims that: (1) he was denied a fair trial when the trial court improperly coerced the jury; (2) his due process rights were violated when the trial court admitted evidence of Nguyen's prior domestic violence acts to bolster the complaint witness's credibility; (3) trial counsel rendered ineffective assistance; and (4) the cumulative errors were prejudicial.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.

This Court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1).  It is error for a federal court to review *de novo* a claim that was adjudicated on the merits in state court.  *See Price v. Vincent*, 538 U.S. 634, 638-43 (2003) (reversing judgment of 6th Circuit granting habeas relief on *de novo* review where claims did not meet standards for relief under § 2254(d)(1)).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  *Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  A petitioner must present clear and convincing evidence to overcome the presumption of correctness; conclusory assertions will not do.  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

## DISCUSSION

I.     **Due Process – Jury Coercion**

A.     *Facts*

Nguyen first claims that the trial court erred when it asked for a count of votes when it appeared that the jury was deadlocked, and that its subsequent instructions were "too coercive and should not have been given."  (Pet. Attach. at 6.)

The California Court of Appeal summarized the facts with respect to this claim:

B. *Jury Deadlock*

Defendant asserts that, when the jury reported being deadlocked, the trial court erred by inquiring into the number of votes for conviction and acquittal.  It then exacerbated the coercive effect of that improper inquiry by its comments and supplemental instructions.  He argues that the court then compounded those errors by refusing to instruct as requested by his defense counsel.  He is not contending that the court gave the *Allen*-type [FN3] of instruction forbidden in *People v. Gainer* (1977) 19 Cal.3d 835. [FN4]

FN3. See *Allen v. U.S.* (1896) 164 U.S. 492, 501 [17 S.Ct. 154].

United States District Court
Northern District of California

United States District Court
Northern District of California

FN4. In *Gainer*, the California Supreme Court held, as judicially declared rule of criminal procedure, that is was "error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*People v. Gainer*, *supra*, 19 Cal.3d at p. 852.)

1. *Background*

The record shows that, at approximately 3:30 p.m., on the first full day of deliberations, the court received a communication from the foreperson that indicated the jury was deadlocked.  The foreperson had written that he was not sure if the jurors could reach a verdict because they had "a majority, but not a unanimous agreement."

Out of the jury's presence, the prosecution requested a *Moore* instruction. (See *People v. Moore* (2002) 96 Cal.App.4th 1105.)   Defense counsel indicated that it was premature to give such instruction and he wished to know the jury count.

The trial court brought the jury into the courtroom and inquired into the deadlock.  After learning that the jury's deadlock was identical on all three counts, the court asked the foreperson to indicate the vote "in terms of the number for and the number against."  The foreperson replied, "Nine believe guilty, three not guilty."  The foreperson explained that "some people view a witness as more credible than others."  The court indicated that it could give no further guidance on the issue of credibility and the jury had "received all of the instructions on the evaluation of witnesses…."  The foreperson told the court that he definitely did not see the jurors making any more progress that day or even perhaps the next day.  The court indicated that it would speak with the attorneys and stated: "Obviously, our preference is and I'm sure your preference is too that if it's humanly possible to reach a verdict, then, of course, we want you to.  But if you can't, you can't.  [¶]  My thought is to ask you to come back tomorrow.  Because of the amount of time that's left today, certainly I don't want… any rushing."

While discussing when the jurors should return the next morning, the court said, "But given the fact that… a holiday is coming up, you may want to come in earlier.  I mean, nine, is that all right?"  The court and foreperson

agreed that the jurors would reconvene at 9 a.m. the following morning and the court then indicated that the jurors were free to go for the evening.

After the jury was gone, defense counsel expressed surprise that the court "asked which way the votes were" rather than asking for just the numerical count. When the court questioned why defense counsel did not approach when he heard the court's inquiry, defense counsel explained that he did not react in time.

The next day, the court stated that it had misunderstood defense counsel's request for a jury count. Defense counsel unsuccessfully moved for a mistrial based on the disclosure that a majority favored conviction. Counsel also voiced objections to the proposal to give a *Moore* instruction to the jury to facilitate further deliberations.

One of defense counsel's concerns with giving a supplemental *Moore* instruction was that, given the revelation that the majority of jurors favored conviction, the jurors might perceive the instruction as "telling the minority to reconsider their position…." Defense counsel argued that the instruction did not adequately explain that minority jurors have no greater duty than majority jurors to reexamine their views, each juror was entitled to make his or her own decision, and the jury was not required to reach a verdict. The court indicated that it would instruct pursuant to *Moore* over counsel's objections.

Defense counsel then requested the court to additionally instruct that "each juror is entitled to their [sic] own individual verdict and… a case does not have to reach a verdict." The court announced that it would read CALCRIM Numbers 200 and 3550 in addition to the *Moore* instruction. The court believed that the additional language was contained in those standard instructions but, if defense counsel found some language was missing from those instructions, the court would be "happy to consider it." It declined defendant's request for a special instruction.

At about 9:44 a.m. that same day, the court reread CALCRIM Numbers 200 and 3550 and gave a supplemental *Moore* instruction to the jury. Defense counsel again requested a mistrial because the instructions did not indicate that the minority jurors had no greater duty than the majority jurors to reexamine their views and did not mention the option of not reaching a verdict. The court denied the request without prejudice.

Shortly after noon, the jury announced it had reached a verdict. The jury found defendant guilty of all counts.

13

(Op. at 11-13.)

**B.    *Applicable Law***

"Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  Thus, an instruction is unconstitutionally coercive if it denies the defendant the due process right to a trial by a fair and impartial jury.  *DeWeaver v. Runnels*, 556 F.3d 995, 1007 (9th Cir. 2009).  The use of a supplemental jury charge given by the court to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation has long been sanctioned.  *See Allen v. United States*, 164 U.S. 492, 501-02 (1896).

The Ninth Circuit has said that in a habeas case involving a state conviction the questions for the court are (1) whether the applicable state court looked at the totality of the circumstances in determining if the instruction was coercive; and (2) whether that court's determination on the coercion question was reasonable.  *Parker v. Small*, 665 F.3d 1143, 1148 (9th Cir. 2011); *DeWeaver*, 556 F.3d at 1007 (state appellate court's holding that supplemental jury instruction containing a hypothetical mildly slanted in favor of the prosecution was not coercive was not contrary to *Lowenfield*).

Federal courts reviewing an *Allen* charge given by a state court must consider the supplemental instruction "'in its context and under all circumstances,'" *Lowenfield*, 484 U.S. at 237 (citation omitted); *Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1993); *Locks v. Sumner*, 703 F.2d 403, 406-07 (9th Cir. 1983).  Whether the comments and conduct of the state trial judge violated due process ultimately turns on whether "'the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision.'"  *Jiminez*, 40 F.3d at 979 (quoting *Locks*, 703 F.2d at 406).  Relief will not be granted "unless it is 'clear from the record' that an *Allen* charge had an impermissibly coercive effect on the jury."  *Rodriguez v. Marshall*, 125 F.3d 739, 750 (9th Cir. 1997).

United States District Court
Northern District of California

1      Because an *Allen* charge carries the potential for jury coercion, the trial judge using

2  the charge should instruct jurors not to surrender their sincere convictions when they

3  reassess their positions.  *See United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir. 1985);

4  *cf. Rodriguez*, 125 F.3d at 750 (no coercion where judge not only advised jurors not to

5  surrender their sincerely held beliefs but 1) made no comment on numerical split, 2) did

6  not know whether the majority favored conviction or acquittal, and 3) did not know the

7  identity of the holdouts; fact that the jury deliberated for four more days and called for a

8  reading of testimony indicated that there had been no coercion).  This assures that the

9  "integrity of individual conscience in the jury deliberation process . . . not be

10  compromised."  *United States v. Mason*, 658 F.2d 1263, 1268 (9th Cir. 1981).

11      **C.**     ***Analysis***

12      The state appellate court agreed with Nguyen that the trial court acted improperly

13  when it asked the jury foreman to disclose the jury split "'in terms of the number for and

14  against' conviction" because the California Supreme Court had disapproved of anything

15  more than a neutral inquiry into numerical division due to the potential coercive effect:

16  "[t]he urging of agreement in such circumstances of course creates in the jury the

17  impression that the court, which has also heard the testimony in the case, agrees with the

18  majority of jurors.  Coercion of the jurors in the minority clearly results."  (Op. at 14-15,

19  citing *People v. Carter* 68 Cal.2d 810, 815-816 (1968).)  However, the court correctly

20  found that the error was merely of state law and not one of federal constitutional

21  magnitude.  (*Id.* at 15, citing *Brasfield v. United States* 272 U.S. 448, 450 (1926);

22  *Lowenfield v. Phelps* 484 U.S. 231, 239-240 (1988) [decision in *Brasfield* was an exercise

23  of Supreme Court's supervisory powers and was not predicated on due process or other

24  constitutional right].)  Under the state supreme court precedent of *People v. Sheldon*, 48

25  Cal.3d 935, 959-960 (1989), the appellate court found that the next step was to consider

26  "whether the trial court's comments and challenged supplemental instructions, which were

27  given to the deadlocked jurors to facilitate further deliberations, had an actual coercive

28

1    effect in light of the disclosure that nine jurors favored conviction on the three counts

2    charged."  (*Id*. at 16.)

3           After reviewing the record and the applicable state law, the appellate court

4    concluded that there was no coercive effect:

5           Defendant asserts that the court's comments to the deadlocked jury were
6           coercive because they indicated that it wanted a verdict if humanly
            possible, "preferably before the long weekend, which meant that the jurors
7           only had one more day to deliberate."  He maintains that the supplemental
            instructions were specifically aimed at the minority jurors and placed
8           excessive pressure on them to acquiesce in the guilty verdicts.

9
            In determining whether there is reasonable probability of jury agreement, a
10          court must exercise its power "without coercion of the jury, so as to avoid
            displacing the jury's independent judgment 'in favor of considerations of
11          compromise and expediency.' (*People v. Carter*, *supra*, 68 Cal.2d at p.
            817….)"  (*People v. Breaux* (1991) 1 Cal.4th 281, 319.)  "[T]he question of
12          coercion is necessarily dependent on the facts and circumstances of each
            case…."  (*Ibid.*; see *People v. Carter*, *supra*, 68 Cal.2d at p. 816.)  As
13          recognized in *Carter*, "reversible error may be found in excessive pressure
            upon the jury 'to reach a verdict, whatever its nature, rather than no verdict
14          at all.'"  (*People v. Gainer* (1977) 19 Cal.3d 835, 851.)

15
            In *People v. Moore*, *supra*, 96 Cal.App.4th 1105, an appellate court held
16          that the trial court did not err by giving a certain jury instruction when the
            jury reported a deadlock.  (*Id.* at p. 1108.)  It found that "the challenged
17          instruction did not exert pressure on the jurors as a whole to reach a
            verdict."  (*Id.* at p. 1108, 1118.)  It pointed to the instructional language
18          telling the jury that the "'goal as jurors should be to reach a fair and
19          impartial verdict *if you are able to do so* based solely on the evidence
            presented and without regard to the consequences of your verdict [or]
20          regardless of how long it takes to do so.' (Italics added.)"  (*Id.* at p. 1121.)
            It also noted that the jury was directed to "consider carefully, weigh and
21          evaluate all of the evidence presented at trial, to discuss their views, and to
22          consider the views of their fellow jurors" and instructed that "it was their
            duty as jurors to deliberate with the goal of arriving at a verdict on the
23          charge '*if you can do so without violence to your individual judgment*.'
24          (Italics added.)"  (*Ibid.*)

25
            The appellate court in *Moore* concluded: "Contrary to defendant's
26          argument on appeal, the jury was never directed that it was required to

27

28

reach a verdict, nor were any constraints placed on any individual juror's responsibility to weigh and consider all the evidence presented at trial.  The trial court also made no remarks either urging a verdict be reached or indicating possible reprisals for failure to reach an agreement.  In short, it is clear the trial court took great care in exercising its power 'without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency…. Nothing in the trial court's comment in the present case properly may be construed as an attempt to pressure the jury to reach a verdict….' (*People v. Proctor* (1992) 4 Cal.4th 499, 539….)" (*Ibid.*)

In *People v. Whaley* (2007) 152 Cal.App.4th 968, after learning that the jurors were split 11 to one, the trial court "gave a supplemental instruction taken from the decision in [*Moore*]."  (*Id.* at p. 974.)  On appeal, the defendant argued that *Moore* had been wrongly decided and the trial court's instructional suggestion to use role playing as a method of deliberation "placed undue pressure" on the single holdout juror "to change his or her opinion."  (*Id.* at p. 982.)  The majority of this court held that "the trial court did not err in giving a supplemental instruction based on the instruction approved in *Moore*" since the instruction did not violate the *Gainer* rule that minority jurors cannot be instructed to rethink their position in light of the majority's views or improperly encourage the minority juror to acquiesce in the verdict without exercising his or her independent judgment (see *People v. Gainer*, *supra*, 19 Cal.3d 835, 845, 848-849). (*People v. Whaley*, *supra*, 152 Cal.App.4th at pp. 981-984.)

Defendant urges us to take heed of Justice McAdam's concurring opinion in *Whaley* in which the justice expressed his concerns about the potentially coercive effect of the *Moore*-type instruction and "the need for utmost caution." (*Id.* at p. 985 (conc. opn. of McAdams, J.).)  Defendant suggests that, unlike this case, the supplemental instruction in *Whaley* was not coercive because the trial court did not inquire into whether the jury's numerical division favored conviction, the jury did not reveal the reason for its deadlock, and court did not express its preference that the jury reach a verdict or encourage the jury do so within a limited timeframe.  We do not find these factors determinative.

Although the judge in this case expressed a preference that the jury reach a verdict if "humanly possible" during the exchange with the jury foreperson, the judge also expressly recognized that the jurors might not be able to agree ("But if you can't, you can't").  The upcoming court holiday arose during a discussion regarding when the jury should return the next morning and the record does not show that the judge was pushing the jury to reach a

verdict before that time.

The trial court's supplemental instructions in this case included the following language: "You should try to agree… on a verdict *if you can.  Each of you must decide the case for yourself*, but only after you have discussed the evidence with the other jurors.  [¶]  Do not hesitate to change your mind if you have been convinced that you were wrong.  *But do not change your mind just because other jurors disagree with you.*  Keep an open mind and openly exchange your thoughts and ideas about this case." (Italics added.)  The court told the jury: "It is not my role to tell you what your verdict should be.  *Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what the verdict should be.*"  (Italics added.)

The court also instructed: "Your goal as jurors should be to reach a fair and impartial verdict, *if you are able to do so*, based solely on the evidence presented and without regard for the consequences of your verdict, *regardless of how long it takes to do so*…. [¶]  In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs.  You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced that they are wrong…. [¶]  It is your duty as jurors to deliberate with a goal of arriving at a verdict on the charge *if you can do so without violence to your individual judgment*.  Both the People and the defendant are entitled to the *individual judgment of each juror*."  (Italics added.)

The court suggested that the jurors experiment with different methods of deliberation such as reverse role playing or changing discussion leaders.  But the court expressly cautioned: "By suggesting you should consider changes in your method of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations.  I merely find that you may find it productive to do whatever is necessary to ensure each jury [*sic*] has a full and fair opportunity to express his or her view and consider and understand the views of other jurors."

We conclude that the trial court made no coercive remarks that exerted undue pressure on the minority jurors to change their votes or on the jury as a whole to reach a verdict.  As in *Moore* and *Whaley*, the supplemental instructions in this case did not encourage the minority jurors to acquiesce to the majority.  As in *Whaley*, the court's suggestion regarding role-playing applied equally to the minority and majority jurors and the jury was under no compulsion to use that approach.  (See *People v. Whaley*, *supra*,

United States District Court
Northern District of California

152 Cal.App.4th at p. 983.) The supplemental instructions were evenhanded, respected the integrity of the individual juror's judgments, and did not target the minority jurors. They repeatedly emphasized the importance of each juror's individual judgment. As in *Sheldon*, "the potential for coercion was not realized by anything said or done by the court…." (*People v. Sheldon*, *supra*, 48 Cal.3d at p. 960.) In light of the supplemental instructions, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of any judicial inquiry into the number of jurors for and against conviction.

(Op. at 16-20.)

Here, the state appellate court's conclusion that there was no jury coercion was not unreasonable. First, the comments by the trial court were neutral and did not indicate that he was urging the minority to change their votes. Rather, he acknowledged that it was possible the jury would not be able to reach a verdict and that he did not want them to rush through deliberations: "if it's humanly possible to reach a verdict, then, of course, we want you to. But if you can't, you can't… [¶] Because of the amount of time that's left today, certainly I don't want… any rushing." *See supra* at 12. Accordingly, it is not likely that the jury felt pressured to the point of coercion to reach a verdict by such statements.

Second, the supplemental instructions, which included the following statements, were not likely to coerce the jurors "into relinquishing their views in favor of reach a unanimous decision," *Jiminez*, 40 F.3d at 979: "[e]ach of you must decide the case for yourself"; "[b]ut do not change your mind just because other jurors disagree with you"; "[d]o not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what the verdict should be"; and "[i]t is your duty as jurors to deliberate with a goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment." *See supra* at 18. The jurors were clearly instructed not to surrender their sincere convictions such that the integrity of the individual conscience in the jury deliberation process was not compromised. *See Bonam*, 772 F.2d at 1451; *Mason*, F.2d at 1268. The state court's determination that the instructions were "evenhanded" and "respected the integrity of the individual juror's judgments," *see supra*

19

United States District Court
Northern District of California

at 19, was reasonable.  *Parker v. Small*, 665 F.3d at 1148.  Because the challenged instructions did not have an "impermissibly coercive effect on the jury," Nguyen is not entitled to habeas relief on this claim.  *Marshall*, 125 F.3d at 750.

## II.     Evidence of Prior Domestic Violence

### A. *Facts*

Nguyen claims that the trial court abused its discretion in admitting evidence of his prior domestic violence and thereby violated his right to due process.  (Pet. Attach. at 18.)

The state appellate court summarized the facts regarding this claim:

The prosecutor sought a pretrial ruling that evidence of defendant's prior threats and acts of violence against T. and her family was admissible in the prosecution's case in chief on grounds the evidence was relevant to T.'s state of mind in belatedly reporting defendant's conduct and to the mother's state of mind when she failed to act upon learning what had happened from her daughter.  At the hearing on the motion, the prosecutor indicated that six or seven prior incidents were relevant, including defendant's act of setting the house of fire, his act of going after T.'s mother with an axe, which resulted in a felony conviction, his act of domestic violence against T.'s mother, which resulted in a misdemeanor conviction, misdemeanor violations of a restraining order, and assaults with a knife against T. and her brother.  Defense counsel argued that the evidence was inadmissible propensity evidence under Evidence Code section 1101 and, in any case, should be excluded under Evidence Code section 352 as prejudicial.  He also complained that admission of the evidence would require "seven mini trials within this trial."  The trial court ruled that evidence of one violation of the protective order and evidence of the axe attack and a knife attack would be admissible.  It made clear that the section 352 issue could be revisited at trial.

At trial, without objection, T. testified that fear of defendant delayed her reporting of the June 2007 incidents and briefly described prior acts of threats of violence by defendant that she had witnessed or learned about from her mother.  Upon defense counsel's request, the court instructed the jury: "You are to only use the prior domestic violence acts and convictions to determine [T.'s] credibility in saying that she is afraid.  Defendant's prior domestic violence acts and convictions must not be used as character evidence to determine whether the defendant committed the charged crimes."   Before  the  parties'  stipulation  concerning  defendant's  prior

convictions was read to the jury, defense counsel clarified that he was preserving his prior evidentiary objections.  After the stipulation was read to the jury, the court admonished the jury: "You are only to use the prior domestic violence acts and convictions to determine [T.'s] credibility in saying that she is afraid.  Defendant's prior domestic violence acts and convictions must not be used as character evidence to determine whether the defendant committed the charged crimes."

(Op. at 20-21.)

## B. *Applicable Law*

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.  *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838 (1984)).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.

1    1995); *Colley*, 784 F.2d at 990.  But note that only if there are no permissible inferences

2    that the jury may draw from the evidence can its admission violate due process.  *See*

3    *Jammal*, 926 F.2d at 920.

4       **C.** *Analysis*

5       The California Court of Appeal rejected this claim on the merits:

6
         Defendant now contends that the trial court abused its discretion under
7        Evidence section 352 in admitting evidence of his prior domestic violence
         acts and convictions and, thereby, violated his due process rights under the
8        Fourteenth Amendment to the United States Constitution.

9        "A trial court has broad discretion under Evidence Code section 352 to
10       'exclude evidence if its probative value is substantially outweighed by the
         probability that its admission will (a) necessitate undue consumption of
11       time or (b) create substantial danger of undue prejudice, of confusing the
         issues, or of misleading the jury.'"  (*People v. Milles* (2010) 48 Cal.4th 158,
12       195.)   "A trial court's exercise of discretion in admitting or rejecting
         evidence pursuant to Evidence Code section 352 'will not be disturbed on
13       appeal unless there is a manifest abuse of that discretion resulting in a
14       miscarriage of justice.' [Citation.]"  (*People v. Cain* (1995) 10 Cal.4th 1,
15       33.)

16       Evidence of defendant's violent acts or threats of violence that T. had
17       witnessed or of which she had knowledge had a tendency in reason to
         establish that she genuinely feared defendant, which in turn had a tendency
18       in reason to explain her delayed reporting to someone outside the family
         and was clearly relevant to her credibility.  (See Evid. Code, §§ 210, 780;
19       Cal. Law Revision Com. Com., 29 B, Pt. 2 West's Ann. Evid. Code (1995
20       ed.) foll. § 780, p. 586; see also § 351.)   The stipulation regarding
         defendant's convictions lent credibility to T.'s testimony that such acts had
21       occurred and had made her afraid.  The trier of fact "may consider in
22       determining the credibility of a witness any matter that has any tendency in
         reason to prove or disprove the truthfulness of his testimony at the hearing,
23       including" the "existence or nonexistence of any fact testified to by him."
         (Evid. Code, § 780, subd. (i).)
24

25       Although defendant now attempts to minimize the probative value of
26       evidence of defendant's acts or threats of violence, such evidence was
         highly relevant with respect to T.'s credibility, a key issue at trial, since the
27       delay in reporting to anyone outside her family could be a basis for

28                                                    22

United States District Court
Northern District of California

attacking her credibility in claiming that defendant had sexually molested her. Defendant also argues that using such evidence to show the state of mind of T.'s mother was "highly speculative" because the mother did not testify. While T.'s mother did not ultimately testify at trial, this eventuality does not affect the propriety of the pretrial ruling based upon the prosecution's proffered theories of relevancy. The evidence of defendant's prior acts or threats of violence was eventually admitted at trial for the limited purpose of assessing T.'s credibility in saying that she was afraid.

Citing *People v. Brown* (1993) 17 Cal.App.4th 1389, defendant maintains that other-crimes evidence is not admissible to bolster witness's credibility because the evidence is more prejudicial than probative. In *Brown*, the defendant was charged with molestation (§ 288, subd. (a)) and the trial court admitted testimony regarding prior uncharged crimes of molestation to reinforce the credibility of the detectives who had interviewed defendant Brown and who had testified that the defendant admitted molesting his daughter and previously molesting his niece and at least one of his sisters. (*Id.* at p. 1394.) The appellate court found that, in that case, the other-crimes evidence led "only to an inference Brown had a propensity to molest young girls." (*Id.* at p. 1396.)

This case is distinguishable from *Brown*. The other-crimes evidence in *Brown* was not relevant to a victim's state of mind and her conduct consistent with that state of mind. Here, the chain of reasoning establishing the relevancy does not rely on any impermissible inference of propensity or character. In addition, unlike *Brown*, the other crimes were not the same or substantially similar to the crimes being tried.

Defendant maintains that the evidence ruled admissible was "highly prejudicial." For purposes of Evidence Code section 352, "'prejudicial' is not synonymous with 'damaging' but refers instead to evidence that "'uniquely tends to evoke an emotional bias against defendant'" without regard to its relevance on material issues. (*People v. Bolin* (1998) 18 Cal.4th 297, 320…; see also *People v. Edelbacher* (1989) 47 Cal.3d 983, 1016….)" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) "In applying this statute we evaluate the 'risk of "*undue*" prejudice, that is, "'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,'" not the prejudice "that naturally flows from relevant, highly probative evidence."' [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 148.)

Defendant contends that evidence of his prior acts of domestic violence evoked an emotional bias against him and the jury was likely to misuse the

evidence to conclude that he was an individual of bad character. We conclude that the trial court acted within its discretion in concluding such potential undue prejudice did not outweigh the probative value of that evidence. Furthermore, the court adequately addressed any potential undue prejudice through appropriate limiting instructions. [FN7] "The presumption is that limiting instructions are followed by the jury. (See, e.g., *People v. Anderson* (1987) 43 Cal.3d 1104, 1120….)" (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

> FN7. In addition to giving limiting instructions during trial, the trial court's main charge before submission to the jury included the following instruction regarding evidence of defendant's prior acts not charged in this case: " Do not [] consider the evidence for any other purpose except for the limited purpose of evaluating the believability of [T.'s] fear of the defendant. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] The People must still prove each charge beyond a reasonable doubt.

Defendant also argues that its admission necessitated undue consumption of time and was cumulative since an expert testified regarding delayed reporting by child victims. The trial court limited the number of admissible incidents in its pretrial ruling. In addition, the evidence of defendant's acts and threats of violence toward T. and her family was not duplicative of the CSAAS evidence regarding delayed reporting by child victims. The former was relevant to T.'s actions and credibility in particular while the latter applied to only child victims in general.

Applying the deferential abuse of discretion standard, we conclude that the trial court's pretrial ruling was not an abuse of discretion. Since defendant interposed no due process objection below, his constitutional claim is cognizable on appeal only insofar as he is arguing that any error in making the evidentiary ruling had the additional legal consequence of depriving him of due process. (*People v. Partida* (2005) 37 Cal.4th 428, 435-436; see Evid. Code, § 353.) Our rejection of the evidentiary claim also disposes of the due process claim. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; *People v. Cain*, *supra*, 10 Cal.4th at p. 33.)

(Op. at 21-25.)

Nguyen's claim is without merit. As stated above, *see supra* at 22, the admission of challenged evidence violates due process only if there are no permissible inferences that

the jury may draw from it.  *See Jammal*, 926 F.2d at 920.  The state appellate court was not

unreasonable in finding that the prior domestic violence evidence was relevant and

probative of T.'s credibility: "[e]vidence of defendant's violent acts or threats of violence

that T. had witnessed or of which she had knowledge had a tendency in reason to establish

that she genuinely feared defendant, which in turn had a tendency in reason to explain her

delayed reporting to someone outside the family and was clearly relevant to her

credibility."  *See supra* at 22.  Even though the evidence could indicate propensity, the trial

court gave limiting instructions that specifically charged the jury not to conclude from the

evidence that Nguyen "has a bad character or is disposed to commit crime," *see supra* at

24: "Do not consider the evidence for any other purpose except for the limited purpose of

evaluating the believability of [T.'s] fear of the defendant."  *Id.*

        The permissible inferences and the cautionary instructions support the conclusion

that there was no due process violation.  *See*, *e.g.*, *Houston  v. Roe*, 177 F.3d 901, 910 n.6

(9th Cir. 1999) (admission of similar prior bad acts to show motive and intent, coupled

with limiting instructions, was appropriate; *Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-

81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where

trial court balanced probative weight against prejudicial effect and gave jury cautionary

instruction), *cert. denied*, 499 U.S. 979 (1991); *Gordon v. Duran*, 895 F.2d 610, 613 (9th

Cir. 1990) (admission of uncharged crimes did not violate due process where trial court

gave limiting instruction to jury, jury was able to weigh witness' credibility and evidence

was relevant to defendant's intent); *Butcher v. Marquez*, 758 F.2d 373, 378 (9th Cir. 1985)

(admission of uncharged offenses does not violate constitutional rights where jury had

opportunity to weigh credibility of complaining witness and judge admonished jury to

consider incident only as evidence of intent, not as evidence of bad character).  The

admission of Nguyen's prior domestic violence was not arbitrary or so prejudicial that it

rendered the trial fundamentally unfair.  *Walters v. Maass*, 45 F.3d at 1357.  Accordingly,

it cannot be said that the state court's rejection of this claim was contrary to, or involved an

25

1   unreasonable application of, clearly established Supreme Court precedent.  *See* 28 U.S.C. §

2   2254(d).  Nguyen is not entitled to habeas relief on this claim.

**III.**     *Ineffective Assistance of Counsel*

     **A.** *Claims*

5        Nguyen claims that he was deprived of his Sixth Amendment right to effective

6   assistance by his trial counsel's failure to object to the following: (1) admission of profile

7   evidence; (2) the prosecutor exploiting the profile evidence in his closing argument; and

8   (3) the prosecutor's misconduct in appealing to the passion and prejudice of the jurors

9   during closing argument.  (Pet. Attach. at 24, 29.)

     **B.** *Applicable Law*

11        In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Nguyen

12   must establish two things.  First, he must establish that counsel's performance was

13   deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing

14   professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he

15   must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there

16   is a reasonable probability that, but for counsel's unprofessional errors, the result of the

17   proceeding would have been different."  *Id.* at 694.  A reasonable probability is a

18   probability sufficient to undermine confidence in the outcome.  *Id.*  A court need not

19   determine whether counsel's performance was deficient if the lack of prejudice is clear.

20   *Id.* at 697.

21        The *Strickland* framework for analyzing ineffective assistance of counsel claims is

22   considered to be "clearly established Federal law, as determined by the Supreme Court of

23   the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Cullen v.

24   Pinholster*, 131 S. Ct. 1388, 1403 (2011).  On federal habeas, a petitioner must show that

25   the state court applied *Strickland* to the facts of his case in an objectively unreasonable

26   manner.  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam).  A "doubly" deferential

27   judicial review is appropriate in analyzing ineffective assistance of counsel claims under §

28

United States District Court
Northern District of California

2254.  *See Pinholster*, 131 S. Ct. at 1410-11; *Harrington v. Richter*, 131 S. Ct. 770, 788

(2011) (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same).  The general rule of

*Strickland*, *i.e.*, to review a defense counsel's effectiveness with great deference, gives the

state courts greater leeway in reasonably applying that rule, which in turn "translates to a

narrower range of decisions that are objectively unreasonable under AEDPA."  *Cheney v.*

*Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S.

652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions

were reasonable.  The question is whether there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard."  *Harrington*, 131 S. Ct. at 788.

**C.** *Analysis*

**1.** *Failure to Object to the Admission of Profile Evidence*

The state appellate court found that counsel did not render ineffective assistance by

failing to object to the admission of the alleged profile evidence.

> "In assessing claims of ineffective assistance of trial counsel, we consider
> whether counsel's representation fell below an objective standard of
> reasonableness under prevailing professional norms and whether the
> defendant suffered prejudice to a reasonable probability, that is, a
> probability sufficient to undermine confidence in the outcome. (*Strickland*
> *v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d
> 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217….)  A reviewing court
> will indulge in a presumption that counsel's performance fell within the
> wide range of professional competence and that counsel's actions and
> inactions can be explained as a matter of sound trial strategy.  Defendant
> thus bears the burden of establishing constitutionally inadequate assistance
> of counsel.  (*Strickland v. Washington*, *supra*, at p. 687 [104 S.Ct. at p.
> 2064]; *In re Andrews* (2002) 28 Cal.4th 1234, 1253….)  If the record on
> appeal sheds no light on why counsel acted or failed to act in the manner
> challenged, an appellate claim of ineffective assistance of counsel must be
> rejected unless counsel was asked for an explanation and failed to provide
> one, or there simply could be no satisfactory explanation.  (*People v.*
> *Mendoza Tello* (1997) 15 Cal.4th 264, 266….)  Otherwise, the claim is
> more appropriately raised in a petition for writ of habeas corpus.  (*Id.* at pp.
> 266-267.)"  (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    1. *"Grooming"* Evidence

2    Lewis's testimony on the grooming of child sexual abuse victims was
3    adduced with regard to CSAAS and its element of secrecy. Defendant
     contends, without any citation to authority, that the testimony was
4    objectionable on the grounds it was profile evidence and outside the scope
     of proper CSAAS evidence.
5
6    "Profile evidence" is "not a separate ground for excluding evidence; such
     evidence is inadmissible only if it is either irrelevant, lacks foundation, or
7    is more prejudicial than probative. [Citation.]" (*People v. Smith* (2005) 35
     Cal.4th 334, 357.) CSAAS evidence is admissible if a credibility issue
8    arises due to a victim's delayed reporting, as occurred here. (See *People v.*
9    *Perez* (2010) 182 Cal.App.4th 231; *People v. Sandoval* (2008) 164
     Cal.App.4th 994, 1001; *People v. Patino* (1994) 26 Cal.App.4th 1737,
10   1745; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301; *People v.*
     *Bowker* (1988) 203 Cal.App.3d 385, 394.) "CSAAS testimony has been
11   held admissible for the limited purpose of disabusing a jury of
     misconceptions it might hold about how a child reacts to a molestation.
12   (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301…; *People v.*
13   *Bowker*, *supra*, 203 Cal.App.3d at p. 391….)" (*People v. Patino*, *supra*, 26
     Cal.App.4th at p. 1744.) Where appropriate, CSAAS may be admitted as
14   part of the prosecution's case-in-chief. (See *id.* at p. 1745.)
15
16   In this case, both the trial court's instructions and the testifying expert's
     testimony made clear to the jury that the CSAAS evidence was being
17   admitted only for the limited purpose of evaluating T.'s credibility based on
     her conduct and it could not be used for the purpose of deciding whether
18   defendant committed the charged crimes in particular. Defendant has not
19   demonstrated that defense counsel was remiss in failing to object to the
     "grooming" evidence on the ground it was improper profile evidence or
20   outside the scope of proper CSAAS testimony. "Where 'there was no
     sound legal basis for objection, counsel's failure to object to the admission
21   of the evidence cannot establish ineffective assistance.' (*People v. Cudjo*
22   (1993) 6 Cal.4th 585, 616, 25 Cal.Rptr.2d 390, 863 P.2d 635.)" (*People v.*
     *Ghent* (1987) 43 Cal.3d 739, 772.)
23

24   (Op. at 25-27.)

25       Applying the "doubly" deferential standard of review to this claim under § 2254,

26   this Court cannot conclude that the state court unreasonably applied *Strickland* in rejecting

27   this claim. First of all, Nguyen has failed to show that counsel's performance was

28

deficient.  As discussed by the state court above, the CSAAS was admitted for the limited

purpose of evaluating T.'s credibility, *i.e.*, to explain T.'s description of Nguyen's touching

as "accidental" or "not obvious" as presented by the defense.  *See supra* at 9.  Because

there were permissible inferences to be drawn from it, the admission of the CSAAS

evidence with respect to "grooming" was lawful.  *See Jammal*, 926 F.2d at 920.  Because

Nguyen fails to show that the admission of the evidence was improper, he cannot show

that counsel behaved unreasonably by failing to object to it.  Furthermore, it is not

reasonably probable that Nguyen was prejudiced by the counsel's failure to object because

the trial court and the expert testimony made it clear to the jury that the evidence was not

to be used for the purpose of deciding whether Nguyen actually committed the charged

crimes.  (Op. at 26, 28-29.)  Accordingly, he is not entitled to habeas relief based on this

claim.

### 2. *Failure to Object to Prosecutor's Exploitation of Profile Evidence*

The state appellate court also rejected the claim that counsel rendered ineffective

assistance by failing to object to the prosecutor's "exploitation" of the profile evidence.

> During closing argument, the prosecutor intimated that the jury should
> believe the victim since she had opportunities to exaggerate defendant'
> misconduct but she did not.   He suggested that she instead had
> acknowledged limited wrongdoing by defendant.   The prosecutor then
> asked the rhetorical question how does telling Officer Pham that defendant
> was "kind of trying" to make the touching look accidental help the victim
> since her statement introduces the idea that maybe the touching was
> accidental.  He next argued: "How does it help her?  It doesn't help her.
> What it does do is it makes it chillingly real.  This is grooming.  Remember
> I asked Carl Lewis, what is grooming?   Grooming is when you
> progressively try to make the child more and more comfortable with what's
> going on.  You start out small, and you progressively get more and more
> serious.  [¶]  It's like the guy in the crowded bus or the crowded elevator.
> It's accidental.  We're packed in like sardines.  He has an alibi.  He has a
> built-in alibi.  He's easing into it.  It makes it chillingly real, but it doesn't
> help somebody who is trying to frame someone with lies."

We do not agree with the A.G. that the prosecutor's argument was permissible because it merely urged the jury to not disbelieve the victim because defendant's touching was not inconsistent with the behavior of a child molester.  The CSAAS evidence was admitted for the purpose of helping the jurors evaluate the victim's credibility based on *her conduct*, not to assess the defendant's culpability based on his conduct.  CSAAS evidence is "admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested."  (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)

It is clear that the prosecutor improperly strayed, however briefly, into arguing that the touching constituted grooming behavior by him, which supported a finding that defendant committed the charged crimes.  That argument violated the trial court's instructions regarding the limited use of the admitted CSAAS evidence and contravened established case law that CSAAS testimony is inadmissible for the purpose of proving a particular defendant actually molested an alleged victim.  (See *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino*, *supra*, 26 Cal.App.4th at p. 1744.)

Nevertheless, the claim of ineffective assistance based on defense counsel's failure to object to this argument must be rejected.  ("[A] mere failure to object to… argument seldom establishes counsel's incompetence. [Citations.]" (*People v. Ghent*, *supra*, 43 Cal.3d at p. 772.)  "[C]ompetent counsel may often choose to forgo even a valid objection." (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.)  In this case, defense counsel may have made the reasonable tactical decision that the court's instructions were adequate to address the problem and did not require further admonition of the jury and he would deal with the prosecutor's improper statements in his closing argument.  (See *People v. Welch* (1999) 20 Cal.4th 701, 764 [legitimate tactical decision to not interrupt prosecutor's argument to object to misconduct and to respond in argument]; cf. *People v. Martinez* (2010) 47 Cal.4th 911, 957 [although no objection to prosecutor's allegedly improper argument, defense counsel effectively responded in closing argument].)

Before Lewis testified, the trial court gave the following instruction: "You will hear testimony from an expert regarding Child Sexual Abuse Accommodation Syndrome.  Testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not the alleged *victim's conduct* was not inconsistent with conduct of someone who has been molested in evaluating

the believability of her testimony."  (Italics added.)

Prior to closing argument, the court gave its full instructions to the jury. The court told the jury: "During trial, certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other."  That charge also included the following instruction: "You have heard testimony from Carl Lewis regarding Child Sexual Abuse Accommodation Syndrome.  Carl Lewis' testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [T.'s] conduct was not inconsistent with the conduct of someone who had been molested in evaluating the believability of her testimony."  (See CALCRIM No. 1193.) The court directed the jury to follow the law as explained regardless of the attorney's comments.  It also stated: "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."

In closing argument, defense counsel reminded jurors about the limited purpose of the CSAAS evidence and the court's instruction and indicated that the prosecutor was advocating misuse of that evidence.  He argued: "Now what happens when the accuser, [T.], has been proven to be inconsistent, to be fabricating?  You call in your expert and you try to rehabilitate.  And you try to say, look, you know these are some symptoms that are consistent with this syndrome, a person who may be suffering from this syndrome.  Very important, ladies and gentlemen.  What Carl Lewis testified to cannot prove whether there was sexual abuse or not.  The only purpose of that testimony – I'm going to call it the syndrome for short – is to help you understand these behaviors; okay?  And his honor has provided you CALCRIM 1193 to help you understand that.  [¶]  Mr. Lewis also admitted on the stand that law enforcement and prosecutors have misused the syndrome in the legal arena…. Here, [the prosecutor] is asking you, look past these inconsistencies, look past these fabrications, because it falls within this syndrome.  [¶]  We also know the syndrome does not factor in fabrication.  It does talk about delayed, conflicting, unconvincing disclosure, but those are also indicators of fabrication."

"We presume that jurors comprehend and accept the court's directions. (E.g., *People v. Bonin* (1988) 46 Cal.3d 659, 699….)  We can, of course, do nothing else.  The crucial assumption underlying our constitutional system of trial is that jurors generally understand and faithfully follow instructions. (*Francis v. Franklin*, *supra*, 471 U.S. at p. 325, fn. 9, 105 S.Ct. at p. 1976, fn. 9.)"  (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)  Defendant

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

has not established that his counsel acted incompetently or there is a reasonable probability that the result of his trial would have been different had defense counsel objected to the prosecutor's "grooming" remarks. (See *Strickland v. Washington*, *supra*, 466 U.S. 668, 694.)

(Op. at 27-30.)

Assuming that counsel's failure to object was unreasonable, this claim fails because Nguyen was not prejudiced by counsel's deficient performance. The record shows that the trial court's instructions and counsel's own closing remarks sufficiently inoculated Nguyen from any prejudicial effect of the prosecutor's improper remarks. *See Weygandt v. Ducharme*, 774 F.2d 1491 (9th Cir. 1985) (failure to object to prosecutor's improper closing remarks falls short of constitutional prejudice when considered within "totality of the evidence").

The trial court instructed the jury before the expert's testimony that CSAAS "is not evidence that the defendant committed any of the crimes charged against him" and that it was to be considered "only in deciding whether or not the alleged victim's conduct was not inconsistent with conduct of someone who has been molested in evaluating the believability of her testimony." *See supra* at 30-31. Furthermore, in its full instructions to the jury before closing argument, the trial court reminded jurors that evidence which was admitted for a limited purpose was to be considered "only for that purpose and for no other." *Id*. at 31. The trial court repeated its earlier instruction that expert testimony regarding CSAAS was "not evidence that the defendant committed any of the crimes charged against him" and that it was to be considered "only in deciding whether or not [T.'s] conduct was not inconsistent with the conduct of someone who had been molested in evaluating the believability of her testimony." *Id*. The trial court also stated that "[n]othing that the attorneys say is evidence" and their remarks during opening statements and closing arguments "are not evidence." *Id*. The jury is presumed to have followed the trial court's instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Then during his own closing argument, trial counsel reminded the jury that the CSAAS evidence

32

United States District Court
Northern District of California

was to be used for a limited purpose and that the trial court had provided them with instructions to that effect: "What Carl Lewis testified to cannot prove whether there was sexual abuse or not.  The only purpose of that testimony – I'm going to call it the syndrome for short – is to help you understand these behaviors; okay?  And his honor has provided you CALCRIM 1193 to help you understand that."  *See supra* at 31.  Within the totality of the evidence, it cannot be said that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Nguyen is not entitled to habeas relief on this claim.

### 3. *Failure to Object to Prosecutor's Remarks Appealing to Jury's Passion and Prejudice*

Lastly, the state appellate court found Nguyen was not prejudiced by the prosecutor's remarks appealing to the jury's passion and prejudice.

At the end of the prosecutor's rebuttal argument, he stated: "What I'd leave you with is this.   Look, the law says her word can prove a case beyond a reasonable doubt.  The law says if she gets up here and tells the truth, her word can move mountains.  And that means something not only for the law, but it means something for her as well.  I don't know what this girl's prospects are.  But assuming you did justice in this case, what she will remember is that when she got up here and told the truth, the system worked for her.  She will carry that away for sure."

Defendant maintains that these remarks were an improper appeal to the passion and prejudice of the jurors and defense counsel should have objected.  He contends that the prosecutor was suggesting that, "if the jury did not convict, T. would lose all faith in the justice system and would have a miserable life…."

"It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial. [Citations.]"  (*People v. Fields* (1983) 35 Cal.3d 329, 362.)  "A prosecutor is allowed to make vigorous arguments…, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury. (*People v. Fields, supra,* 35 Cal.3d 329, 362-363…; *People v. Fosselman* (1983) 33 Cal.3d 572, 581-581….)"  (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251.)

Even assuming that the closing remarks constituted prosecutorial misconduct, they were brief and relatively mild. (Cf. *People v. Fields*, *supra*, 35 Cal.3d at p. 362 [prosecutor's argument graphically describing the crime from the murder victim's perspective invited jurors to "depart from their duty to view the evidence objectively" and was an improper appeal for victim sympathy].) Further, a decision whether to object to instances of prosecutorial misconduct is "inherently tactical" and "the failure to object will rarely establish ineffective assistance. [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 419.)

Before argument, the trial court instructed the jurors to "not let sympathy, bias, prejudice, or public opinion influence your decision." The court directed them to "Decide what the facts are in this case" based on only the evidence and made clear that "[n]othing that the attorneys say is evidence." Defense counsel may have made the reasonable tactical choice to not call attention to the prosecutor's remarks, especially since the jurors had been instructed to reach a decision based only on the evidence and to not be influenced by sympathy, bias, or prejudice. (See *People v. Ghent*, *supra*, 43 Cal.3d at p. 773 ["Counsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"].) In addition, defense counsel may have reasoned that it was unnecessary to object since the prosecutor's plea was expressly conditioned upon the victim telling the truth and the defense counsel was arguing that the victim was not telling the truth as reflected by her inconsistent statements and delayed reporting.

Further, we presume the jury followed the court's instruction. (See *People v. Martinez*, *supra*, 47 Cal.4th at p. 957.) We find no reasonable probability that the result of the proceeding would have been more favorable to defendant if his counsel had objected to the prosecutor's remarks. Defendant failed to establish his claim of ineffective assistance of counsel.

(Op. at 30-32.)

This claim also fails for the same reasons discussed in rejecting Nguyen's second ineffective assistance claim, *see supra* at 32, – the trial court's instructions to the jury as discussed by the state appellate court above were sufficient to protect Nguyen from any prejudicial effect of the prosecutor's inappropriate comments. When such a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence

United States District Court
Northern District of California

1    and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8

2    (1987); *Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (the Court condemned egregious,

3    inflammatory comments by the prosecutor but held that the trial was fair since curative

4    actions were taken by the trial judge); *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005)

5    ("we presume jurors follow the court's instructions absent extraordinary circumstances").

6    This presumption may be overcome if there is an "overwhelming probability" that the jury

7    would be unable to disregard evidence and a strong likelihood that the effect of the

8    misconduct would be "devastating" to the defendant.  *See Greer*, 483 U.S. at 766 n.8; *Tan*,

9    413 F.3d at 1115-16 (finding trial fair where jury received instructions five different times

10   to consider only the evidence presented, and not its sympathy for the victim's life story).

11   In light of the state appellate court's observation that the remarks were "brief and relatively

12   mild," (Op. at 31), the Court is not persuaded that this presumption has been overcome.

13   *See Greer*, 483 U.S. at 766 n.8.  Therefore, it is not reasonably likely that the jury would

14   have been unable to disregard the prosecutor's improper appeal to their passion or

15   prejudice and follow the court's instruction to "not let sympathy, bias, prejudice, or public

16   opinion influence your decision," and that "[n]othing that the attorneys say is evidence."

17   *See supra* at 34; *see Richardson v. Marsh*, 481 U.S. at 206.  Accordingly, Nguyen is not

18   entitled to habeas relief on this claim.

19          In sum, the state courts' rejection of Nguyen's ineffective assistance of counsel

20   claims was not contrary to, or involved an unreasonable application of, clearly established

21   Supreme Court precedent.  *See* 28 U.S.C. § 2254(d).

22   **IV.    *Cumulative Error***

23          Nguyen's final claim is that the cumulative effect of the alleged trial court errors

24   and counsel's ineffective assistance entitles him to habeas relief.  (Pet. Attach. at 32.)  In

25   some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the

26   cumulative effect of several errors may still prejudice a defendant so much that his

27   conviction must be overturned.  *See, e.g., Alcala v. Woodford*, 334 F.3d 862, 893-895 (9th

28

Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Here, Nguyen has not demonstrated that there was even one constitutional error. The state courts rejected this claim because there were no errors.  (Op. at 32.)  Nguyen may disagree with the decisions of the state courts, but he has not shown that they were unreasonable under clearly established federal law.  Accordingly, his claim of cumulative error must be denied.

## CONCLUSION

The state courts' adjudication of Nguyen's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is DENIED.

A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Nguyen may seek a certificate of appealability from the Ninth Circuit.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:**  March 14, 2014



_____
WILLIAM H. ORRICK
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


ROT V NGUYEN,

          Plaintiff,

  v.

MATTHEW CATE et al,

          Defendant.

_____/

Case Number: CV12-00616 WHO

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 14, 2014, I SERVED a true and correct copy of the attached, by placing said copy in a postage paid envelope addressed to the person hereinafter listed, by depositing said envelope in the U.S. Mail.


Rot Van Nguyen AB-2155
California Institute for Men
P.O. Box 500
Chino, CA 91708-500


Dated: March 14, 2014

Richard W. Wieking, Clerk
By: Jean Davis, Deputy Clerk